IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JASON DELPH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:20-cv-01086 (LMB/IDD) |
| ) | |
| PRINCE WILLIAM COUNTY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION

Proceeding pro se, plaintiff Jason Delph ("Delph" or "plaintiff") has filed a complaint alleging violations of 42 U.S.C. §§ 1983 and 1985 connected with two traffic stops made by Prince William County police officer Matthew Sciabica ("Sciabica"). Before the Court is defendants' Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss") [Dkt. No. 37]. After receiving a proper Roseboro notice, plaintiff filed an opposition to defendants' motion. Defendants elected not to file a reply. Because oral argument will not further the decisional process, defendants' motion will be resolved on the materials submitted by the parties. For the reasons that follow, defendants' Motion to Dismiss will be GRANTED.

## I. PROCEDURAL HISTORY

On September 15, 2020, plaintiff, acting pro se and in forma pauperis, filed a complaint alleging violations of 42 U.S.C. §§ 1983 and 1985 against Prince William County and eleven current or former Prince William County police officers and supervisors. The complaint was confusingly drafted. Counts 1 and 2 alleged that defendant Sciabica seized plaintiff without probable cause on two separate occasions in violation of plaintiff's constitutional rights; Count 3 alleged that defendants Stephen Kuhn ("Kuhn") and David Ehrhardt ("Ehrhardt") conspired with

Sciabica to harass the plaintiff; and Count 4 alleged that Prince William County and the other defendants were responsible for allowing officers to engage in a pattern and practice of harassment and police brutality. The complaint included three claims for relief. Claim I sought damages under 42 U.S.C. § 1983 against Sciabica in relation to the two arrests mentioned in Counts 1 and 2; Claim II sought damages under 42 U.S.C. § 1983 for supervisory and municipal liability against the supervisor defendants and Prince William County in relation to the factual allegations in Count 4; and Claim III sought damages under 42 U.S.C. § 1985 for the conspiracy detailed in Count 3.

On November 6, 2020, defendants entered a special appearance, moving to dismiss for insufficient service of process. [Dkt. No. 17]. The Court denied the motion, finding that although service was defective it was through no fault of plaintiff. At the same time, the complaint was reviewed pursuant to the procedures set forth in 28 U.S.C. § 1915, which govern complaints filed by pro se plaintiffs seeking in forma pauperis status. As a result of that review, the Court dismissed the complaint without prejudice, explaining to plaintiff the deficiencies he would need to correct in any amended complaint. [Dkt. No. 25].

In response to that order, plaintiff filed the pending Amended Complaint, which did not correct the structural problem, and merely added some additional language to the already existing counts and claims. [Dkt. No. 26]. On April 9, 2021, finding plaintiff's additions to Count 4 of the Amended Complaint insufficient to sustain a supervisory liability claim, the Court dismissed defendant Prince William County, along with the eight supervisor defendants [Dkt. No. 28].[1] Though not explicitly stated in that order, the Court intended that Claim II (Count 4) be

---

[1] On May 6, 2021, plaintiff filed a notice of interlocutory appeal as to the dismissal order [Dkt. No. 33]. That appeal was summarily dismissed by the Fourth Circuit on August 24, 2021. [Dkt. No. 43].

dismissed as a result of those defendants being dismissed. As a result, the only issues remaining to be addressed in the defendants' Motion to Dismiss are the allegations in Claim I against Sciabica for malicious arrest, unreasonable search and seizure, and excessive force in violation of the Fourth, Sixth, and Fourteenth Amendments, as applied under 42 U.S.C. § 1983, and the allegations in Claim III against Kuhn and Ehrhardt under 42 U.S.C. § 1985 for conspiring to deprive plaintiff of his constitutional rights.

## I. FACTUAL BACKGROUND

### A. The First Arrest[2]

On May 5, 2018, at around 2 a.m., Delph was driving on Lee Highway on his way to a friend's house after he had been at a bar that evening. Am. Compl. [Dkt. No. 26] at ¶ 11.; [Dkt. No. 38-1] Body Camera Footage ("Video 1") at [00:42; 01:12]. While driving, Delph swerved across the lane lines. See Dkt. 38-2; Video 1 at [01:29]. After observing that driving conduct, Sciabica pulled Delph over on suspicion of driving while intoxicated. Am. Compl. [Dkt. No. 26] at ¶ 1.1; Dkt. 38-2; Video 1 at [1:26-1:28]. After stopping Delph, Sciabica asked him where he was coming from, to which Delph replied that he had been at a bar and admitted he had consumed two tall IPA beers, with his last drink occurring about an hour before the traffic stop.

---

[2] The facts described in this Memorandum Opinion are taken from the Amended Complaint, as well as the video camera that was worn by Officer Sciabica during both traffic stops, and the various criminal complaints filed against plaintiff in General District Court that were provided by defendants to support their Motion. Although at the motion to dismiss stage courts are generally limited to those facts presented in the complaint, a court may also consider exhibits "integral to and explicitly relied on in the complaint." Phillips v. LCI Intern, Inc., 190 F.3d 609, 618 (4th Cir. 1999). In his Amended Complaint, at ¶ 2.10, Delph explicitly references the body camera footage ("…as can be seen upon review of body cam footage."). Further, the Court may also consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (1990)). Referring to these additional materials does not convert defendants' Motion to Dismiss into one for summary judgment.

Id. at [01:43-02:19]. Delph admitted to swerving across the lane lines, but explained that it was due to being unfamiliar with the roads and unsure which road was his turn. Id. at [01:29-01:36; 03:06-03:38]. Sciabica asked Delph to take a preliminary breath test, but he refused. Id. at [10:55, 15:06-15:11]. He did agree to take a set of field sobriety tests. Am. Compl. [Dkt. No. 26] at ¶ 1.2; Video 1 at [03:46-15:15]. Delph told Sciabica that he had been awake for nearly 22 hours, so if he looked tired, Sciabica should take that into account. Id. at [05:26-05:35; 07:30-07:36; 10:26].

Delph performed all the requested tests while conversing with Officer Sciabica. In that conversation, he slurred the word breathalyzer once, see Video 1 at [15:54], and continually asked whether he had passed the field sobriety tests, to which Sciabica replied that Delph had not "failed" the tests because "there is no passing or failing," Id. at [09:30-10:55; 15:36-15:42]; ¶ 1.6, Sciabica decided to place Delph under arrest for driving under the influence ("DUI") based on his observations of plaintiff. Video 1 at [15:15]. After being told he was being arrested for driving under the influence, Delph initially resisted sitting down in the police car, despite Sciabica's order to sit down. After arguing with Sciabica for over a minute, plaintiff eventually cooperated. Id. at [18:25-19:42]. Once Delph was secured in the police car, Sciabica conducted a search of Delph's pickup truck, during which he seized a blunt of marijuana. Id. at [21:08]. Sciabica can be heard commenting during the video footage to a colleague who had arrived at the scene that the truck smelled of marijuana as soon as he had walked up to it. Id. at [04:20]; [30:05-30:25]; see also [Dkt. 38-2]. The video also reflects that Sciabica read Delph the consequences of refusal to take a blood alcohol test and asked Delph if he would consent to a breath or blood alcohol test, which Delph refused. ¶ 1.3, [Dkt. No. 38-2]; Video 1 at [26:09-29:32]. Based on the above, Sciabica cited Delph for three offenses: driving under the influence

of alcohol/drugs in violation of Va. Code 18.2-266; possession of marijuana in violation of Virginia Code 18.2-250.1; and unreasonable refusal to take a blood alcohol test in violation of 18.2-268.3. [Dkt. No. 38-2].[3]

The charges were dismissed on September 5, 2018. See [Dkt. No. 38-3]. In his Amended Complaint, Delph alleges that this dismissal was granted because there was no evidence in the body camera footage of his intoxication. ¶ 1.12.

**B. The Second Arrest**

The next summer, at 11:15 p.m. on August 5, 2019, Delph was at the MVP Bar and Grille when another patron sat down at his table. The owner of the bar called the police to have this patron removed. Am. Compl. [Dkt. No. 26] at ¶ 2.1-2; ¶ 3.1. Defendants Ehrhardt, Sciabica, and Kuhn arrived at the bar around 11:30 p.m. to remove the patron. In doing so they stood near plaintiff's table. Id. at ¶ 2.3; ¶ 2.4; ¶ 3.1. Somewhat inconsistent with this allegation, the Amended Complaint also alleges that after Kuhn noticed Delph he sent a text message to Sciabica and Ehrhardt saying, "That's your boy at MVP." ¶ 3.2. Ehrhardt replied, "My hero." Id. at ¶ 3.3. Kuhn also messaged Sciabica and Ehrhardt Delph's license plate number. Id. at ¶ 3.4.

At an undisclosed time the officers left the bar, and around 1:45 a.m. on August 6, 2019, Delph left as well. Am. Compl. [Dkt. No. 26] at ¶ 2.5. A few minutes later and less than a quarter of a mile from the bar, Sciabica saw plaintiff's truck drive through a red light on the merging ramp from Linton Hall onto Lee Highway, and pulled him over for unlawfully running a red light. Am. Compl. [Dkt. No. 26] at ¶¶ 2.6, 2.8; [Dkt. No. 38-4] Body Camera Footage ("Video

---

[3] Under Virginia law, an individual who unreasonably refuses to have their blood tested for alcohol after being arrested for suspected drunk driving is in violation of Virginia law, because by engaging in the privilege of driving on Virginia roads, drivers impliedly consent to such testing. See Va. Code § 18.2-268.2, 268.3.

2") at [00:47-1:38]. It is undisputed that Delph had come to a complete stop before proceeding through the light. Video 2 at [03:11-03:47].

  As Sciabica approached Delph's truck, Delph greeted Sciabica by name and Sciabica asked Delph for his license and registration. Video 2 at [00:30-00:45]. Delph asked, "Why'd you pull me over?" to which Sciabica explained that Delph "[r]an a red light." Delph disputed this characterization, and they debated the issue for about a minute. Id. at [0:47-2:06]. Ultimately, Sciabica said, "You can argue that in court, okay?" Id. Then, given the early morning hour, his observation that plaintiff had been in the MVP Bar and Grille since at least 11:30 p.m. and was only a quarter of a mile from the bar, and noting that Delph smelled of alcohol, Sciabica asked "How much alcohol have you had to drink tonight, Mr. Delph?" Id. at [2:10]. In response, Delph said he had "no idea" and then said he did not drink because it was against his religion. Am. Compl. [Dkt. No. 26] at ¶ 2.11; Video 2 at [02:06-2:26]. In the video recording, Sciabica can be heard telling Delph that he smelled alcohol and asking Delph to take a preliminary breath test. Id. at [2:15-2:30]. Delph refused and also refused to take any field sobriety tests. Am. Compl. [Dkt. No. 26] at ¶ 2.14; Video 2 at [5:20-5:47]. Delph then called a friend, who over speakerphone encouraged Delph to comply with the officer. Video 2 at [05:33-6:59]. Sciabica decided to arrest Delph for suspected DUI, [6:30-6:45], and asked him to get out of his truck while Delph was still on the phone. The video shows Delph initially refusing to comply, which led Sciabica to reach into the truck to pull Delph out by grabbing his arm. Am. Compl. [Dkt. No. 26] at ¶¶ 2.15, 2.18; Video 2 at [06:00-7:12]. Delph is pulled out of the truck and then handcuffed. Id. at [7:10-7:20]. Sciabica asked a second officer who had arrived to provide backup to hold Delph during the search of Delph's person, id. at [08:41], but Delph was largely compliant with the search. See, e.g., id. at [8:50-8:59] (stepping out of his shoes as requested). As he sat down in the police car,

6

Delph complained that the handcuffs were tight, to which Sciabica responded, "You shouldn't have resisted." Id. at [9:35-9:43]. During the search of Delph's vehicle that followed, Sciabica again found marijuana. Id. at [12:14-12:19]. As a result, Delph was cited for three offenses: driving under the influence in violation of Virginia Code 18.2-266; possession of marijuana in violation of Virginia Code 18.2-250.1; and unreasonable refusal in violation of Virginia Code 18.2-268.3 [Dkt. No. 38-5].

On January 22, 2020, the Commonwealth's Attorney elected to nolle prosequi all charges related to the August 6, 2019 stop because no signs were posted at the intersection stating that a vehicle could not turn right on red. [Dkt. No. 38] at 5.[4]

After this experience, Delph filed a formal complaint with the Prince William County Police Department. ¶ 4.1. According to the Amended Complaint, disciplinary action was taken against Sciabica for having "failed to deliver the level of service expected of him, therefore appropriate corrective action has been taken." ¶ 4.3. There is no allegation in the Amended Complaint that any other defendant was disciplined.[5]

III. ANALYSIS

Defendants raise two grounds for dismissal of this action. First, they argue that because Officer Sciabica had probable cause to stop, search, and arrest plaintiff during both encounters, the Amended Complaint fails to state a claim. Additionally, defendants argue that the qualified

---

[4] This explanation is not in plaintiff's Amended Complaint, nor is it plain from any of the relied-upon exhibits; however, defendants have stated it in their brief. Because this rationale works in plaintiff's favor and there is good cause to believe it is true, the Court has included it in the statement of facts.

[5] Plaintiff also alleges that the defendant police department "created an atmosphere of tolerance for unconstitutional behavior and has ignored a history of abuse of accepted law enforcement standards," including by "awarding Defendant Matthew Sciabica multiple times with DUI prevention awards." ¶ 4.5. He alleges that "many members of the Gainesville, VA community" have "similar stories of [p]olice brutality and corruption." ¶ 4.4

7

immunity doctrine protects them from suit even if probable cause were lacking for their actions. Both arguments are meritorious.

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint when a "plaintiff's allegations fail to state a claim upon which relief can be granted." Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). A complaint must be more than speculative and must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). When deciding a motion to dismiss, the court assumes that the facts alleged in the complaint are true and resolves factual disputes in the plaintiff's favor. Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009); however, a court "is not bound by the complaint's legal conclusions," conclusory allegations, or unwarranted inferences. Id.

Qualified immunity shields government officials from liability for civil damages to protect those officials' exercise of discretion and best judgment in performing their duties. As the Fourth Circuit has explained, qualified immunity ensures that officials do not face liability for "bad guesses in gray areas" of the law, but only for obvious violations of "clearly established" rights. Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Determining the application of qualified immunity involves a two-step inquiry. First, the court must determine "whether a constitutional violation occurred," and second, "whether the right violated was clearly established." Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012); see Harlow v. Fitzgerald, 457 U.S. 800, 818–19 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.... If

8

the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.").

The Court construes plaintiff's Amended Complaint to allege violations of three individual constitutional rights, as incorporated by the Fourteenth Amendment against the states: 1) the Sixth Amendment right to be informed of the nature and cause of an accusation; 2) the Fourth Amendment right to be free from unreasonable searches and seizures; and 3) the Fourth Amendment[6] right to be free from excessive force.[7] As the facts alleged do not describe any violation of plaintiff's constitutional rights, the Amended Complaint will be dismissed for failure to state a claim. Even if the Amended Complaint had adequately pleaded sufficient facts to make out plausible constitutional violations, the defendants would be entitled to qualified immunity.

**A. Sixth Amendment**

The Amended Complaint fails as a matter of law to allege a Sixth Amendment violation because this constitutional protection applies to a defendant's criminal trial rights. Specifically, it requires that an accused "be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation." In re Oliver, 333 U.S. 257, 275 (1948). Notably, the Sixth Amendment does not

---

[6] Excessive force claims under the Fourteenth Amendment's substantive due process only apply when the Fourth Amendment and Eighth Amendment standards do not apply. In this case, because Delph alleges that excessive force was used during an arrest (a seizure) and before any conviction or sentence, the Fourth Amendment standard governs. See Graham v. Connor, 490 U.S. 386 (1989).

[7] Plaintiff also appears to allege a violation of Article I, Section 10 of the Constitution. This provision prohibits bills of attainder and ex post facto laws, among other state actions. Because plaintiff was arrested for violating statutory crimes, which the legislature passed without specifically targeting plaintiff for arrest, this section of the Constitution does not apply to this civil action.

require an immediate communication of charges upon arrest.[8] See Terry v. Ohio, 392 U.S. 1, 16 (1968) (holding that arrests are governed by the Fourth Amendment, not the Sixth Amendment). Rather, the notice requirement is typically accomplished through a charging document, such as an indictment or information, given to a defendant so that the defendant can prepare for trial. See, e.g. Hartman v. Lee, 283 F.3d 190 (4th Cir. 2002). The exhibits attached to defendant's motion, including the criminal complaints and arrest warrants, show that Delph was informed of all the charges he faced and was given an opportunity, in court, to defend against them. See [Dkt. Nos. 38-3, 38-6]. For all these reasons, plaintiff's Sixth Amendment claims will be dismissed.

## B. Unreasonable Search and Seizure

The Fourth Amendment to the Constitution protects against unreasonable searches and seizures. A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" Terry v. Ohio, 392 U.S. 1, 20 n. 16 (1968). Conducting a traffic stop constitutes a seizure. Delaware v. Prouse, 440 U.S. 648, 653 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments."). To avoid violating a person's Fourth Amendment right in making a traffic stop, the officer must have a reasonable basis for his actions. For a traffic stop to be reasonable, there must be reasonable suspicion that "crime is

---

[8] Even if the Sixth Amendment required an explanation at the moment of arrest, the body camera footage for both stops shows that Sciabica told plaintiff the reasons why he was stopped and placed under arrest. For example, during the first stop, Sciabica explained, "At this time you are going to be under arrest for driving under the influence of alcohol." When plaintiff asked, "But why I am I being arrested?" Sciabica reiterated, "Because I believe that you were driving under the influence." Five seconds later, Delph again asked, "Why I am I being arrested?" and Sciabica again said, "Driving under the influence of alcohol." Video 1 at [15:12-15:55]. This conversation was repeated multiple times. See id. at [18:38-18:45]; [29:10-29:15]. During the second stop, Sciabica told Delph, "You're under arrest," to which Delph yelled, "What am I under arrest for?" and Sciabica replied, "Driving under the influence of alcohol." Video 2 at [7:00-7:04]; see also id. at [8:32-8:40].

afoot," Terry, 392 U.S. at 22, 30, or probable cause that a crime has occurred or is occurring. Brinegar, 338 U.S. at 175–76.

Once an automobile has been lawfully stopped, the Constitution generally allows a police officer to search the vehicle for any evidence of a crime that the officer has reasonable or probable cause to believe occurred or is occurring, within the scope of where such evidence might be found. See, e.g., California v. Acevedo, 500 U.S. 565, 579-80 (1991); U.S. v. Ross, 456 U.S. 798, 824 (1982); Chambers v. Maroney, 399 U.S. 42, 52 (1970); Carroll v. U.S., 267 U.S. 132, 153 (1925); see also Arizona v. Gant, 556 U.S. 332, 335 (2009) ("[C]ircumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."). Additionally, an officer may ask a driver such as Delph, who has been stopped for cause, to leave the car, and thereafter conduct other further inquiry. See, e.g., Pennsylvania v. Mimms, 434 U.S. 106 (1977).

Police officers have cause to conduct an arrest whenever "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175–76 (1949).

1. May 15, 2018 Traffic Stop

As to the first stop, plaintiff has conceded that he had swerved across the road lanes, which is unlawful in itself and clearly justified Sciabica to conduct a traffic stop. See Va. Code. § 46.2-804 ("A vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from that lane until the driver has ascertained that such movement can be made safely[.]"). In addition to observing defendant's truck swerve across the lines, the time of the driving behavior, around 2:00 a.m., provided Sciabica with sufficient reasonable suspicion

11

that Delph could be driving under the influence of alcohol to justify stopping him. Accordingly, Sciabica's initial stop of plaintiff was lawful.

Once Sciabica stopped plaintiff and approached his truck, he smelled marijuana and could smell alcohol on plaintiff's person. He also saw plaintiff's bloodshot and teary eyes. In responding to Sciabica's questions, plaintiff admitted having been drinking alcohol. Although it is unclear from the video how plaintiff performed on the field sobriety tests, all these other facts, including plaintiff's refusal to take a roadside breath test and repetitive questions to Sciabica while taking the field sobriety tests, comprised sufficient evidence to establish probable cause to arrest plaintiff for driving under the influence. See [Dkt. No. 38-2].[9] Accordingly, the stop, search, and arrest in 2018 did not violate any of plaintiff's constitutional rights as a matter of law and Sciabica's Motion to Dismiss will be granted as to this claim.

### 2. August 6, 2019 Traffic Stop

Plaintiff contends that his constitutional right to be free of unreasonable seizures was violated during the August 6, 2019 traffic stop because he was stopped for lawfully turning right on red when it was safe to do so.[10] In Virginia, "except where a traffic control device is placed prohibiting turns on steady red, vehicular traffic facing a steady red circular signal, after coming to a full stop, may cautiously enter the intersection and make a right turn." Va. Code § 46.2-835. The parties agree that no sign was posted prohibiting turns on red and that plaintiff came to a full stop, after which he proceeded in a rightward direction through the red light to merge onto Lee

---

[9] There was even more justification for arresting plaintiff after Sciabica also found, through a search incident to arrest, that plaintiff was in possession of marijuana. Id.

[10] If the stop was unlawful, the ensuing arrest and search would also be unlawful and all evidence obtained would have to be excluded from any prosecution as "fruit of the poisonous tree." Utah v. Strieff, 579 U.S. 232 (2016).

Highway; however, it is less clear if the location of the turn was an "intersection," which is defined as:

> (i) the area embraced within the prolongation or connection of the lateral curblines or, if none, then the lateral boundary lines of the roadways of two highways that join one another at, or approximately at, right angles, or the area within which vehicles traveling on different highways joining at any other angle may come in conflict; ...

Va. Code § 46.2- 100 ("Definitions"). A view of where Lee Highway and Linton Hall meet does not show an immediate right angle because there is a brief merging ramp.[11] Further, because of the nature of the merging ramp, the vehicles traveling on Delph's route between the roads would never "come into conflict." Accordingly, defendant makes a reasonable argument that no lawful right on red could be made on this merging ramp, justifying a traffic stop on that basis. At worst, Sciabica made a reasonable "guess in a gray area" of the law in making this stop, which cannot as a matter of law give rise to a constitutional violation. Maciariello, 973 F.3d at 298.

In addition, the facts leading up to the 2019 stop included Sciabica knowing that plaintiff had been at the MVP Bar and Grill since at least 11:30 p.m. and then observing him driving his truck around 1:45 a.m. only a quarter of a mile from the bar. The first question Sciabica asked after he had explained to Delph why he had been stopped was how many drinks Delph had consumed, which shows that Sciabica had suspicion that Delph was driving under the influence of alcohol. Video 2 at [2:10]. A law enforcement officer with reasonable suspicion that crime is afoot may briefly stop someone to conduct further investigation. Terry, 392 U.S. at 22, 30. If that investigation reveals criminal activity, the officer may proceed with a search and arrest. Id. As Sciabica had reasonable suspicion that Delph was driving under the influence of alcohol, it was

---

[11] Defendants attached a photograph of the intersection to their Motion to Dismiss. Because the layout of the intersection is "integral" to the allegations in the complaint, the Court can consider this photograph in its analysis without converting defendants' motion to one for summary judgment. Phillips v. LCI Intern, Inc., 190 F.3d 609, 618 (4th Cir. 1999).

13

lawful for him to conduct a traffic stop to further investigate that suspicion.[12] Accordingly, even if the Amended Complaint alleged that an unlawful stop occurred, the allegations still do not defeat defendant's claim that he is entitled to immunity as to this stop because the stop was not made in violation of plaintiff's clearly established constitutional rights.

Once plaintiff was stopped, he gave obviously false and suspicious answers to Sciabica's investigatory questions. Video 2 at [02:06-2:26]. Additionally, he smelled of alcoholic beverage and had "glassy glazed over eyes." [Dkt. No. 38-5]. He refused to perform field sobriety tests or to take a breathalyzer or blood alcohol tests. Id. And in a search incident to that arrest, Sciabica found a "black case" which had marijuana in it. Id. The Amended Complaint therefore shows that Sciabica had probable cause to arrest Delph for DUI, possession of marijuana, and unreasonable refusal, and this claim will be dismissed.

### C. Excessive Force

The Amended Complaint also alleges that plaintiff experienced excessive force during his second arrest, in violation of his rights under the Fourth Amendment. Specifically, he alleges that Sciabica "battered" him by "physically removing, by means of excessive force, [Delph] from vehicle" for refusing to take the field sobriety test and for arguing with Sciabica. He also alleges that the handcuffs were "too tight." Am. Compl. ¶¶ 2.15, 2.20.

The use of force by law enforcement officials during the course of an arrest may amount to a violation of the Fourth Amendment if it is unreasonable under the circumstances:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long

---

[12] Plaintiff also argues that the stop was pretextual or that Officer Sciabica had improper motives. Neither factor has any bearing on the lawfulness of the stop. See Whren v. United States, 517 U.S. 806 (1996).

14

recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. ... Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396–97 (1989) (internal citations omitted).

The record before the Court shows that Sciabica's limited use of force was reasonable to effectuate the arrest of plaintiff under the circumstances. Video 2 clearly shows that after Delph ignored Sciabica's order to leave his truck and instead chose to talk on his cell phone, Sciabica reached into the truck and pulled Delph by his arm then pushed him up against the truck to handcuff him. Video 2 at [06:00-7:12]. The video footage does not show any evidence of punches, kicks, blows, or other physical acts by defendant. Further, there is no allegation in the Amended Complaint that plaintiff suffered any physical injury from Sciabica's actions.

The law gives an arresting officer the authority to use appropriate force to remove a recalcitrant suspect from his car, to handcuff and arrest him, and to search his person. Delph's verbal objection to being arrested and his resistance to being removed from his truck reasonably required Sciabica to pull Delph out of the truck by his arm and then handcuff him. Delph may have felt uncomfortable in handcuffs, but they were justified under the circumstances.

Even if Sciabica had improperly targeted Delph or did not like him, as suggested by some of the text messages quoted in the Amended Complaint and portions of Sciabica's comments

15

captured by the audio in the body camera footage, those facts do not make Delph's use of force claim any more viable. See Graham, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force."). The video footage shows that Sciabica only used the physical force necessary to achieve lawful ends. Therefore, the force used was reasonable under the totality of the circumstances and no constitutional violation occurred.

### D. Conspiracy

In Claim III, the Amended Complaint alleges that Kuhn and Ehrhardt conspired to violate plaintiff's civil rights in violation of 42 U.S.C. § 1985.

> To state a cause of action under section 1985(2), which deals with obstructing justice or intimidating parties, witnesses or jurors, a litigant must demonstrate some interference with the course of justice in state courts. Section 1985(3), which concerns the denial of equal protection under the law, requires a plaintiff to prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

Davis v. Hudgins, 896 F. Supp. 561, 570–71 (E.D. Va. 1995), aff'd, 87 F.3d 1308 (4th Cir. 1996) (internal references omitted). Delph has not clarified under which section of § 1985 he brings his conspiracy claim, but under either section he has failed to allege sufficient facts to make out a cause of action. There is no allegation anywhere in the complaint that Kuhn and Ehrhardt—whose only conduct relates to the text messages they sent to Sciabica on August 5, 2019—interfered with "the course of justice in state courts." Indeed, Delph has not been injured at all by the state courts, which dismissed the criminal charges against him. Therefore, the Amended Complaint fails to state a claim under § 1985(2). If proceeding under § 1985(3), the Amended Complaint also fails to state a claim because it does not identify a protected class to which plaintiff belongs and does not make any allegations of invidious discrimination based on class.

16

Lastly, because Sciabica had reasonable grounds to stop plaintiff on August 5, 2019, any involvement of Kuhn and Ehrhardt in alerting Sciabica to plaintiff's presence in a bar or providing his license plate information would not as a matter of law constitute a conspiracy to deprive plaintiff of his civil rights. The Amended Complaint lacks allegations of "any specific acts caused by the alleged conspiracy that injured Plaintiff.... Because Plaintiff has only put forward broad allegations that do not indicate any actual violation of Plaintiff's civil rights, nor the existence of any conspiracy, the Court [grants] Defendants' motions to dismiss Plaintiff's section 1985 claims." Id. at 571. See also Buschi v. Kirven, 775 F.2d 1240 (4th Cir. 1985). Accordingly, defendants' Motion to Dismiss the claim under 42 U.S.C. § 1985 will also be granted.

## IV. CONCLUSION

For the above stated reasons, which show that plaintiff has failed to allege sufficient facts to support any of his claims and has failed to rebut defendants' entitlement to qualified immunity, all of the claims in the Amended Complaint will be dismissed by an Order to be issued with this Memorandum Opinion.

Entered this 19th day of April, 2022.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge